UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HELLO I AM ELLIOT, INC., and SERGIO
VILLASENOR,

                                        Plaintiffs,

                    -v-

DEREK J. SINE, VANDER HOLDINGS LLC,
VANDER GLOBAL, LLC, and VANDER GROUP,
LLC,

                                        Defendants.

19 Civ. 6905 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Hello I Am Elliot, Inc. ("Hello I Am Elliot"), and Sergio Villasenor, Hello I

Am Elliot's Chief Executive Officer, bring this action against defendant Derek J. Sine, along

with defendants Vander Holdings LLC, Vander Global, LLC, and Vander Group, LLC (together,

the "Vander Entities").  Plaintiffs bring claims in trademark, copyright, defamation, and tortious

interference with prospective business relations under both federal and state law.  Plaintiffs

allege that defendants improperly used Hello I Am Elliot's trademark (the "ELLIOT" mark) on

their website and social media postings, and defamed Villasenor to Hello I Am Elliot's investors

and board of directors.  Defendants move to dismiss plaintiffs' Amended Complaint, while

plaintiffs move for a preliminary injunction.  For the reasons that follow, the Court grants

defendants' motion to dismiss in full and denies plaintiffs' motion for a preliminary injunction.

## I.     Background

### A.     Factual Background[1]

#### 1.     The Parties

Plaintiff Hello I Am Elliot is a Delaware corporation with its principal place of business in New York.  AC ¶ 13.  It is a startup with a global e-commerce platform, "Elliot."  *Id.* ¶¶ 5, 24.  Elliot's software purports to connect merchants to a global marketplace where they can easily sell and ship their products across multiple platforms.  *See id.* ¶¶ 24, 26.  The mark for the Elliot platform is the word "ELLIOT."  *Id.* ¶ 24.

Plaintiff Villasenor founded Hello I Am Elliot and serves as its CEO.  *Id.* ¶ 27.  He created—and coded—Elliot and operates and markets the platform.  *Id.* ¶¶ 23, 27.

Defendants Vander Holdings LLC and Vander Global, LLC, are Nevada LLCs with their principal places of business in New York.  *Id.* ¶¶ 15–16.  The AC alleges that plaintiffs were unable to locate a company registered in the name of defendant Vander Group, LLC ("Vander Group"), in either New York or Nevada.  *Id.* ¶¶ 17, 47.

Defendant Sine is the managing director of the Vander Entities.  *Id.* ¶ 14.

#### 2.     The Elliot Platform and ELLIOT Mark

In January 2017, Villasenor created Elliot.  *Id.* ¶ 23.  In March 2017, Hello I Am Elliot consistently began using the ELLIOT mark in connection with the Elliot platform—including through the prominent display of ELLIOT on the Elliot website—and has since actively marketed using the ELLIOT mark.  *Id.* ¶¶ 25, 34–35.  Since July 2017, Hello I Am Elliot has continually operated the Elliot platform.  *Id.* ¶ 36.

---

[1] This account is drawn from plaintiffs' Amended Complaint.  Dkt. 27 ("AC").  For the purposes of resolving defendants' motion to dismiss, the Court accepts all factual allegations in the AC as true, drawing all reasonable inferences in plaintiffs' favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

In August 2017, Elliot's intellectual property, including its software and the ELLIOT mark, were transferred from Studio86 LLC ("Studio86"), of which Villasenor is the sole member, to Hello I Am Elliot.  *Id.* ¶¶ 37–38.  The ELLIOT mark has a strong online presence and is recognized by merchants, retailers, and "the relevant market."  *Id.* ¶¶ 32–33.  The media has also reported on ELLIOT.  *Id.* ¶ 35.  The AC alleges that the mark is "inherently distinctive" and "arbitrary," because the word ELLIOT has no common association with the e-commerce industry.  *Id.* ¶ 33.

The use of the Elliot platform has grown over time.  By April 2017, merchants were using Elliot to sell and ship their goods internationally.  *Id.* ¶ 28.  At the time of the filing of the AC, more than 300 merchants in 30 countries had used Elliot to sell and ship their products.  *Id.* ¶ 29; *see also id.* ¶ 32.  Hello I Am Elliot has also garnered approximately $13,000 in sales and "an enterprise pipeline" of $1.2 million, and has spent $658,000 on marketing expenses.  *Id.* ¶¶ 30–31.  Since January 2018, Hello I Am Elliot has raised more than $3 million in venture capital funds, including investments from Bowery Capital, Susa Ventures, Acceleprise, Bam Ventures, Flexport, and SV Angel.  *Id.* ¶ 26.

### 3.    Defendants' Alleged Trademark and Copyright Infringements

On March 22, 2017, Villasenor met Sine, who represented that he was the managing director of Vander Group, another e-commerce company.  *Id.* ¶ 39.  The two discussed the possibility of Studio86, Villasenor's company, collaborating with Vander Group.  *Id.*  Villasenor later discovered that Sine had misrepresented the assets of Vander Group.  *See id.* ¶ 43.

Two months later, on May 18, 2017, Villasenor, Sine, and two others incorporated Vander International Corp. ("Vander International").  *Id.* ¶ 40.  Villasenor served as the president and a director of Vander International, and Sine was both its vice president and a director.  *Id.*

¶¶ 41–42.  Vander International conducted business for two months, until July 2017.  *Id.* ¶ 45.

Two years later, on April 17, 2019, Vander International was formally dissolved.  *Id.* ¶¶ 45–46.

On June 8, 2017, Vander Group's Instagram posted a photograph of the ELLIOT mark,

with the following caption:  "Have you gotten a chance to discuss our software Elliot with our

team at #irce17 yet?  If not, be sure to schedule a meeting before we head to New York!"[2]  *Id.*

¶ 54.  Then, on or about July 20, 2017, Sine authored an online post about Elliot on the Vander

Entities' website.  *See id.* ¶¶ 55–56.  The post is entitled, "Say 'Hello' to Elliot.  Your Passport to

Global Commerce"; includes a byline for "Derek J. Sine, Managing Director"; and is

accompanied by a Vander logo, although it is unclear if that logo is associated with any

particular Vander Entity or Vander International.  *See id.* ¶¶ 55–58.  The post states, "[t]oday,

I'm pleased to announce the Beta release of Elliot, our proprietary Omnichannel syndication

software[.]"  *Id.* ¶ 56.

On August 1, 2017, Hello I Am Elliot and Vander Group entered into a referral affiliate

agreement (the "Affiliate Agreement").  *Id.* ¶ 48.  The Affiliate Agreement was the only business

agreement between Hello I Am Elliot and Vander Group.  *See id.* ¶ 52.  It provided that Vander

Group would help market Elliot.  *Id.* ¶ 48.  Specifically, the Affiliate Agreement stated that

Vander Group would "cooperate with Elliot, from time to time, to plan co-marketing events and

activities as mutually agreeable, designed to produce new leads and opportunities for Elliot

products and services" and granted Vander Group a nonexclusive, nontransferable, and

revocable license in Hello I Am Elliot's "trade names, trademarks, service marks, 'd/b/a's,

names, URLs, or logos," including the ELLIOT mark, to do so.  *Id.* ¶¶ 48–49.  With regard to

---

[2] The AC states that this post was removed from Vander Group's Instagram, but the Court notes that the post is currently public at the link provided in the AC.  *See* AC ¶ 54 n.1.

this license, the Affiliate Agreement expressly prohibited Vander Group from using the ELLIOT

mark in any way that would "deceive others, create a likelihood of confusion or destroy or

diminish [the mark's] goodwill." *Id.* ¶ 50.

Hello I Am Elliot owns the code for the Elliot software, along with the ELLIOT mark.

*See id.* ¶¶ 37, 60.  The Affiliate Agreement did not grant Vander Group or Sine the right to claim

ownership of the Elliot platform or the ELLIOT mark.  *Id.* ¶ 50.  The Vander Entities and Sine

have never possessed, controlled, or had access to the Elliot software, nor do they have the skills

to recreate its code.  *Id.* ¶¶ 51, 60.

On September 6, 2017, and again on June 20, 2019, Hello I Am Elliot sent cease-and-

desist letters to Sine and the Vander Entities, asking them to stop infringing Hello I Am Elliot's

trademark and copyright.  *Id.* ¶¶ 63–64.  Defendants have refused to do so.  *Id.*

### 4.     Defendants' Alleged Defamatory Statements

Much of the defamation controversy alleged in the AC revolves around Sine and

Villasenor's relationships with Sine's ex-girlfriend, Kathryn Kosmides.

On July 23, 2017, Villasenor received an email from Kosmides's mother, which

described Sine's stalking and harassment of Kosmides.  *Id.* ¶ 44.  Kosmides's mother informed

Villasenor that Kosmides had obtained a protective order against Sine and asked Villasenor if he

knew of an address where Sine could be served with the order.  *Id.*

On December 1, 2017, the New York County Family Court issued a protective order

against Sine.  *Id.* ¶ 65.  On December 8, 2017, Sine emailed plaintiffs' counsel in response to the

September 6, 2017 cease-and-desist letter.  *Id.* ¶ 66.  He stated:

> I imagine this is being brought up now as I just wrapped up an out of court
> settlement with my previous domestic partner last Friday.  After parting ways with
> Brittany [O'Steen, Villasenor's girlfriend,] and Sergio [Villasenor], your clients
> took it upon themselves to befriend my former domestic partner as she was
> litigating against me for monetary compensation.

*Id.* On February 23, 2018, Kosmides sued Sine in New York state court for defamation, intentional infliction of emotional distress, and attempted coercion. *Id.* ¶ 67.

In summer 2019, Sine sent a series of emails to shareholders and investors of Hello I Am Elliot, which addressed Villasenor's alleged involvement with Kosmides's litigation.[3]  The AC alleges that the statements in these emails are false, *see id.* ¶¶ 69, 72–73, 78–83, and that Villasenor's first contact with Kosmides's counsel occurred on June 4, 2019, *see id.* ¶ 70. Plaintiffs' June 20, 2019 cease-and-desist letter also asked Sine to stop making defamatory statements, *id.* ¶ 77, but Sine did not do so.  Sine's statements include the following:

- On May 22, 2019, Sine emailed a Hello I Am Elliot shareholder, stating, "Sergio [Villasenor] sued me multiples [sic] times after I invested in Elliot." *Id.* ¶ 69; Sine Decl., Ex. A ("May 22, 2019 Email") at 1.

- On June 9, 2019, Sine emailed several employees of Acceleprise, an investor in Hello I Am Elliot, claiming that Villasenor and O'Steen were working with the financial sponsor of Kosmides's litigation against Sine.  AC ¶ 71; Sine Decl., Ex. B ("June 9, 2019 Email") at 1.  Sine stated that Villasenor and O'Steen had "put their full support behind

---

[3] Sine's allegedly defamatory statements are within these emails.  For each email statement referenced in the AC, defendants have provided the full text of the email in exhibits attached to the declaration of Derek J. Sine. *See* Dkt. 31 ("Sine Decl.").  In resolving a motion to dismiss, courts may consider documents attached to the complaint, those incorporated by reference into the complaint, and those that are "integral" to the complaint. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  Documents are integral to the complaint if the complaint "relies heavily" on their "terms and effect." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  The Court can only consider integral documents, however, if there are "no material disputed issues of fact regarding the relevance of the document," and it is "clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).  These emails are integral to the AC, as the AC relies on the statements in them as the basis for its defamation claim.  And there appears to be no dispute as to the emails' authenticity or accuracy.  The Court has thus considered these emails in connection with the motion to dismiss.

[Kosmides] in public and private[,]" and that Villasenor had "partnered up" with

Kosmides in "offering [Sine] a rushed settlement [o]n December 20th of 2017 . . . prior to

the seed announcement [of Hello I Am Elliot on] January 15th, 2018 to clear the cap

table"—a spreadsheet that shows a company's equity capitalization—and "define our

relationship with Elliot[.]"  AC ¶ 71 & n.2; June 9, 2019 Email at 1.  Sine further wrote

that he had "financed Elliot's early stage development" but was "wiped off the cap table"

and "a narrative was sold that [Sine] threatened to kill Sergio, blackmailed him and was

generally a horrible person to fall in line with the accusations [Kosmides] made."  AC

¶ 71; June 9, 2019 Email at 1.

- On June 10, 2019, Sine again emailed one of the Acceleprise employees, stating that

  Villasenor had "pivoted the business burning $900k in the process."  AC ¶ 73; Sine

  Decl., Ex. D ("June 10, 2019 Email") at 1.  Sine further stated that he "believe[d]

  [Villasenor and Hello I Am Elliot] misappropriated investor funds breaking the corporate

  veil to wipe [Sine] out of the company and/or tarnish [his] reputation."  June 10, 2019

  Email at 2; *see also* AC ¶ 73.  Sine added that he was "facing multiple felony charges

  over these false allegations."  AC ¶ 73; June 10, 2019 Email at 2.

- On June 12, 2019,[4] Sine emailed Acceleprise employees a third time.  *See* AC ¶ 74; First

  June 12, 2019 Email.  In this email, he stated, among other things, that Villasenor,

  O'Steen, and Hello I Am Elliot had "worked hand in hand with the opposing party

  [Kosmides] who is now trying to vacate their civil lawsuit."  AC ¶ 74; First June 12, 2019

  Email at 1.

---

[4] The AC states that Sine sent this email on June 11, 2019, AC ¶ 74, but the email itself is dated
June 12, 2019 at 12:13 a.m., Sine Decl., Ex. C ("First June 12, 2019 Email") at 1.

- In a second email to Acceleprise on June 12, 2019, Sine wrote that he "believe[d] to the best of [his] abilities that funds were misappropriated given the timeline of events." AC ¶ 75; Sine Decl., Ex. E ("Second June 12, 2019 Email") at 2.

- In a third June 12, 2019 Acceleprise email, Sine stated, "Sergio has continued to lie to me time and again[,] and it will be interesting to see how he spins this. I imagine he'll threaten litigation and attempt to sue me with your capital." Sine Decl., Ex. F ("Third June 12, 2019 Email") at 1; *see also* AC ¶ 76.

- On July 18, 2019,[5] after plaintiffs sent the first cease-and-desist letter to Sine, Sine emailed plaintiffs' counsel Tor Ekeland, copying Hello I Am Elliot investors at Acceleprise, Bowery Capital, and Susa Ventures. AC ¶ 78; July 18, 2019 Email. In that email, Sine asked if Villasenor was "attempt[ing] to bully [him] with investor capital" and to "knock [him] off and paint [him] as some monster . . . to cover [Villasenor's] tracks." AC ¶ 78; July 18, 2019 Email at 1. Sine further stated that Villasenor had purposefully given him an incorrect address "where [Villasenor] ha[d]n't worked out for months and ha[d] been evading service for nearly a month now." AC ¶ 79; July 18, 2019 Email at 1. Sine claimed that Villasenor had "financed and/or played a role in a malicious #MeToo hoax over the last two years[,]" had "in private and public . . . befriended [Kosmides] [and] the guy she had an affair with," and had "maliciously assisted her counsel well after [Sine] was under the impression [they had] both moved on[.]" AC ¶ 80; July 18, 2019 Email at 1. Sine wrote that Villasenor "has continued to slander [Sine's] name in an attempt to knock [him] off professionally and personally."

---

[5] The AC states that Sine sent this email on July 19, 2019, AC ¶ 78, but again this does not align with the date on the email. The email is dated June 18, 2019 at 11:47 p.m. Sine Decl., Ex. G ("July 18, 2019 Email").

AC ¶ 80; July 18, 2019 Email at 1.  Sine also implied again that Villasenor had funded Kosmides's litigation against him: "[B]oth Sergio and [Kosmides] ran out of cash at the same time and it's on record an outside financier footed [Kosmides's counsel's] 'fixer fee' against [Sine].  [Kosmides] couldn't find a guarantor let alone pay rent in NYC yet she miraculously has the cash at the same time she befriended [Villasenor]."  AC ¶ 80; July 18, 2019 Email at 1.  Finally, Sine stated that Villasenor "is an unethical pathological liar and ultimately a conman."  AC ¶ 81; July 18, 2019 Email at 1.

- The July 18, 2019 email included, in its email chain, a prior June 20, 2019 email that Sine had sent to Ekeland, purportedly copying the Hello I Am Elliot board of directors.  *See* AC ¶ 82; July 18, 2019 Email at 1.  By copying investors on the July 18, 2019 email, they also became aware of the content of the June 20, 2019 email.  In that June 20, 2019 email, Sine had stated:

> Your client syndicated malicious court documents to my employees and partners before I had access to them.  During this time your client was gaslighting me and tried to claim I threatened his life and was trying to kill him as well.  Your client has tried to pay me off in the past and has threatened me multiple times with lawyers threatening to sue me masked through frivolous trademark claims . . . .  Sergio wired me back an investment "interest-free" in which he tried [sic] to a reverse wire claiming wire fraud and then tried to pay me off with investor capital on behalf of Elliot prior to announcing the seed round . . . .

> I have a timeline and statement of facts that match up perfectly with [Kosmides's] litigation.  I have good cause to believe your client played a role.  Heck, he's added her on LinkedIn, promoted her startup and got behind this hoax within my professional community.  Sergio never met my ex-girlfriend or engaged with her during our partnership.

> AC ¶ 82; July 18, 2019 Email at 2.

In addition to these emails, Sine falsely claimed on AngelList that he is an investor in Hello I Am Elliot.  AC ¶ 84.  The AC alleges that these statements have harmed Hello I Am Elliot's reputation.  *Id.* ¶ 85.

### B.       Procedural History

On July 24, 2019, plaintiffs filed their initial complaint.  Dkt. 1.  On both September 10, 2019 and October 23, 2019, defendants asked for extensions of time to respond to the complaint. Dkts. 18, 20.  The Court granted both requests.  Dkts. 19, 21.  On November 1, 2019, defendants filed their first motion to dismiss.  Dkts. 22–25.  On November 4, 2019, the Court instructed plaintiffs to either amend their complaint or oppose defendants' motion.  Dkt. 26.

On November 22, 2019, plaintiffs amended their complaint.  AC.  On December 13, 2019, defendants filed their second motion to dismiss, Dkt. 28, along with a memorandum of law, Dkt. 29 ("Def. Mem."), the declaration of Daniel A. Singer, Esq., Dkt. 30, and the Sine Declaration and its attached exhibits, Sine Decl.  On December 27, 2019, plaintiffs filed their opposition.  Dkt. 32 ("Pl. Mem.").  On January 1, 2020, defendants, with consent of plaintiffs, asked for an extension to file their reply, Dkt. 33, which the Court granted, Dkt. 34.  On January 10, 2020, defendants filed their reply, Dkt. 35 ("Def. Reply"), the second declaration of Daniel A. Singer, Esq., Dkt. 37, and the second declaration of Derek J. Sine, Dkt. 36.

On January 22, 2020, plaintiffs filed their motion for a preliminary injunction, Dkt. 39 ("Pl. PI Mem.").  On February 14, 2020, defendants filed their opposition.  Dkt. 46 ("Def. PI Mem.").  On February 28, 2020, plaintiffs filed their reply.  Dkt. 50 ("Pl. PI Reply").

## II.      Motion to Dismiss

### A.       Applicable Legal Principles

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is

properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## B.      Discussion

The AC brings an action for (1) trademark infringement, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against Sine and Vander Group; (2) a declaratory judgment for copyright ownership against Sine and Vander Group; (3) defamation *per se* under New York state law against Sine; and (4) tortious interference with prospective business relations under New York state law against all defendants. Defendants move to dismiss each claim. The Court addresses each in turn.

### 1.      Trademark Infringement

Defendants fault the AC's trademark claim for failing to plead that the ELLIOT mark is protectable, that Sine is liable in his personal capacity, and that a permanent injunction could be warranted. *See* Def. Mem. at 11–13. Because the Court agrees that the AC has failed to allege that the ELLIOT mark is protectable, it has no occasion to address the two other issues.

To prevail on a Lanham Act trademark infringement claim, a plaintiff must show that (1) his or her mark is entitled to protection, and (2) defendant's use of that mark is likely to cause confusion. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005) (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993)); *see also*

*Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 992–93 (2d Cir. 1987).  Defendants contest only the former here.

"A trademark is protectable . . . if it is 'either validly registered or a qualifying unregistered trademark.'"  *Trombetta v. Novocin*, 414 F. Supp. 3d 625, 630 (S.D.N.Y. 2019) (quoting *Prof'l Sound Servs., Inc. v. Guzzi*, 349 F. Supp. 2d 722, 730 (S.D.N.Y. 2004), *aff'd*, 159 F. App'x 270 (2d Cir. 2005)); *see also 815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 646 (2d Cir. 1988) (section 43(a) Lanham Act claim "may be asserted despite the lack of a registered trademark").  The ELLIOT mark is not registered, and therefore the AC must allege that it is a qualifying unregistered mark.

To determine whether an unregistered mark is protectable, courts assess how distinctive such a mark is.  *See Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 531 (S.D.N.Y. 2012).  To do this, courts sort the mark at issue into one of four categories "famously elucidated" by Judge Friendly: generic, descriptive, suggestive, and arbitrary or fanciful.  *Id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)).  Generic marks are never entitled to protection.  *Einhorn v. Mergatroyd Prods.*, 426 F. Supp. 2d 189, 195 (S.D.N.Y. 2006).  Descriptive marks are protectable "only if they are shown to have acquired secondary meaning to consumers."  *Id.*  And suggestive, arbitrary, and fanciful marks are inherently distinctive and thus protectable.  *Id.* at 194–95.  The Court first addresses the proper categorization of the ELLIOT mark, followed by the issue of secondary meaning.

### a.      Categorization of the ELLIOT Mark

Defendants argue that the ELLIOT mark is, at most, descriptive because it is a personal name.  Def. Mem. at 11.  Plaintiffs contend that because "Elliot" is not the name of a real person connected to Hello I Am Elliot, it is arbitrary.  *See* Pl. Mem. at 4; *see also id.* at 6–7.  The Court agrees with defendants.

12

The Second Circuit has held that "personal names—both surnames and first names—are generally regarded as descriptive terms which require proof of secondary meaning." *815 Tonawanda St. Corp.*, 842 F.2d at 648; *see also Yarmuth-Dion*, 835 F.2d at 993 ("[A] personal name . . . is a descriptive mark."); *Patrizzi v. Bourne In Time, Inc.*, No. 11 Civ. 2386 (PAE), 2013 WL 3975948, at *4 (S.D.N.Y. Aug. 5, 2013) ("An individual's personal name is protectable under the Lanham Act 'only when it acquires secondary meaning[.]'" (citation omitted)).  Courts in this Circuit have found marks involving first names in particular to be descriptive.[6]  *See, e.g.*, *815 Tonawanda St. Corp.*, 842 F.2d at 649 (first name "Fay"); *Khan v. Addy's BBQ LLC*, 419 F. Supp. 3d 538, 554 (E.D.N.Y. 2019) (first name "Addy"); *Brown v. Quiniou*, 744 F. Supp. 463, 469 (S.D.N.Y. 1990) (first name "Agatha").

That the ELLIOT mark does not refer to a real individual does not warrant departure from this general rule.  In *815 Tonawanda Street Corp.*, the district court held that plaintiff Fay's Leader Drugs' "Fay's" mark was, at minimum, suggestive because there was no person named "Fay" associated with plaintiff.  *See* 842 F.2d at 647–48.  The Second Circuit reversed, holding

---

[6] Plaintiffs argue that the rule that personal names are descriptive should not be applied strictly to first names.  *See* Pl. Mem. at 6 & n.33.  In support, plaintiffs cite two out-of-Circuit cases, *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986 (7th Cir. 2004), and *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, No. 07 C 1668 (JWD), 2010 WL 2035720 (N.D. Ill. May 19, 2010).  These cases stand for the unremarkable proposition that the application of the general rule that personal names are descriptive is not universally applicable—and courts in this Circuit similarly have not mechanically applied that rule.  *See, e.g.*, *GMA Accessories, Inc. v. Croscill, Inc.*, No. 06 Civ. 6236 (GEL), 2008 WL 591803, at *4 (S.D.N.Y. Mar. 3, 2008) (finding "Charlotte" mark to be suggestive, where it was used in connection with women's fashion items and accessories).  Indeed, the Second Circuit has noted—in the context of surnames—that while "evidence that a mark is a common surname, in the absence of a dictionary definition, is evidence towards establishing a prima facie case of unprotectibility," such evidence is insufficient where a name, such as "Lane," also has a dictionary definition.  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 346 (2d Cir. 1999).  Here, however, the AC does not allege, and the Court does not find, that there is a separate dictionary definition of ELLIOT or that ELLIOT is suggestive in conjunction with the Elliot software.  Thus, the general rule that personal names are descriptive applies.

13

that "Fay's" was descriptive, "even though there was no person named Fay associated with [plaintiff]." *Id.* at 649. This is because "[t]o the buying public, the name 'Fay's Leader' conveys the same *descriptive* impression, whether or not there is—or ever was—a real Fay." *Id.* at 648 (emphasis in original). The Circuit noted that plaintiff had not offered any reason to suggest that Fay's referred to something other than a woman's name. *Id.* The same is true here. Although plaintiffs state that the ELLIOT mark does not refer to anyone associated with Hello I Am Elliot, the AC does not allege—nor do plaintiffs argue—that the mark refers to something other than the common first name. As such, it is properly characterized as descriptive.

### b.    *Secondary Meaning*

Because the ELLIOT mark is descriptive, the relevant question is whether the AC has adequately pled that it has acquired a secondary meaning. *See id.* at 647 (descriptive marks protected "only upon proof of secondary meaning" (internal quotation marks omitted)). Plaintiffs focus on their marketing expenditures, sales and investments, and the number of customers they have in arguing that the AC has alleged secondary meaning. *See* Pl. Mem. at 8. The Court holds that these facts, even if true, are insufficient to support a finding of secondary meaning.

A trademark has secondary meaning "where consumers have come to associate the mark with goods or services from a particular source." *Id.*; *see also Yarmuth-Dion*, 835 F.2d at 993. To assess secondary meaning, courts analyze the following factors: (1) advertising expenditures; (2) consumer surveys linking the mark at issue to the source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *Yarmouth-Dion*, 835 F.2d at 993. "None of these elements is determinative and not every one of them must be proved to make a showing of secondary meaning." *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 282

(S.D.N.Y. 2018) (citation omitted); *see also Big Star Entm't v. Next Big Star, Inc.*,
105 F. Supp. 2d 185, 202 (S.D.N.Y. 2000) ("While each factor does not have to be proved and
no single factor is determinative, plaintiff must satisfy a 'heavy' burden because '[p]roof of
secondary meaning entails vigorous evidentiary requirements.'" (internal citation omitted)
(quoting *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 90 (2d Cir. 1984)).
Although secondary meaning presents a "fact-intensive inquiry" that is often "ill-suited for
resolution at the motion to dismiss stage," *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*,
131 F. Supp. 3d 196, 212–13 (S.D.N.Y. 2015) (citation omitted), the AC here has not alleged the
minimum facts necessary to support a finding of secondary meaning.

   First, as to advertising expenditures, the AC alleges that Hello I Am Elliot has spent
$658,000 on marketing since 2017.  AC ¶ 31.  Tellingly, however, it does not allege that these
advertisements featured the ELLIOT mark.  Although the marketing expenditures are no doubt
substantial, "[m]erely showing that a certain amount was spent on advertising provides little
support for secondary meaning."  *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of
N.J.*, 894 F. Supp. 2d 288, 319 (S.D.N.Y. 2012) (quoting *Marshall v. Marshall*, No. 08 Civ. 1420
(LB), 2012 WL 1079550, at *17 (E.D.N.Y. Mar. 30, 2012), *aff'd*, 504 F. App'x 20 (2d Cir.
2012)).  Instead, plaintiffs must show that the advertisements involved the ELLIOT mark and
that those advertisements caused consumers to associate the product with Hello I Am Elliot.  *See
id.*; *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 371
(E.D.N.Y. 2007).  *Compare GeigTech E. Bay LLC*, 352 F. Supp. at 283 (declining to dismiss
trade dress infringement claim where advertisements attached to complaint demonstrated that

advertising stressed alleged trade dress),[7] and *A.V.E.L.A., Inc.*, 131 F. Supp. 3d at 213 (declining to dismiss trademark infringement claim where complaint alleged plaintiff had spent "significant sums of money . . . advertising the Marilyn Monroe Intellectual Property"), *with Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 598 (E.D.N.Y. 2017) (dismissing trade dress infringement claim for lack of secondary meaning where complaint was silent as to whether advertising stressed alleged trade dress), *and Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 343–45 (E.D.N.Y. 2014) (same).  Without more, the AC's nod to Hello I Am Elliot's "naked advertising statistics" is insufficient to support an inference of secondary meaning. *Jewish Sephardic Yellow Pages, Ltd.*, 478 F. Supp. 2d at 372 (citation omitted).

Second, the AC does not allege any facts related to consumer surveys or consumer recognition of the ELLIOT mark.  *See Bubble Genius LLC*, 239 F. Supp. 3d at 599 (noting that consumer surveys are "highly relevant to the secondary meaning analysis" and dismissing the complaint that was silent at to such surveys).

Third, as to sales success, the AC alleges that that Hello I Am Elliot has accrued $13,000 in sales and has been used by 300 merchants. AC ¶¶ 29–30.  However, "sales success alone cannot establish secondary meaning."  *GeigTech E. Bay LLC*, 352 F. Supp. 3d at 284.  And the AC's sales number, accrued over the course of three years, is much lower than those that courts have found successful.  *See, e.g.*, *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001) (describing $3 million in sales as "indisputable sales success").  And the

---

[7] The Court here has considered cases analyzing secondary meaning in the context of trade dress infringement, in addition to trademark infringement, because "the secondary meaning inquiry is the same for trade dress as it is for a trademark."  *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992).  In the context of advertisements, to be relevant, trade dress advertisements must feature the non-functional aspects of the alleged trade dress, *see GeigTech E. Bay LLC*, 352 F. Supp. 3d at 283, while trademark advertisements must feature the alleged mark.

AC does not allege these sales involved efforts by plaintiffs to associate the ELLIOT mark with

Hello I Am Elliot.  *Cf. A.V.E.L.A., Inc.*, 131 F. Supp. 3d at 213 (declining to dismiss trademark

infringement claim where complaint alleged "significant sales of *licensed* merchandise and

services" (emphasis added)); *Carson Optical, Inc.*, 11 F. Supp. 3d at 344 (dismissing trade dress

infringement claim where complaint alleged "sales and marketing success," sale of "over a

million" products, and capture of "more-than-expected market share," but did not include facts to

support association of trade dress with plaintiff); *Urban Grp. Exercise Consultants Ltd. v. Dick's

Sporting Goods*, *Inc.*, No. 12 Civ. 3599 (RWS), 2013 WL 866867, at *4 n.3 (S.D.N.Y. Mar. 8,

2013) ("Substantial sales of a product, if . . . unaccompanied by a concomitant effort on the

seller's part to associate the product's trade dress with the source of the product rather than the

product itself, do not establish that a product's trade dress has acquired secondary meaning.").

  To be sure, the AC also alleges that Hello I Am Elliot has had investment success:  It has

raised $3 million in venture capital, has an "enterprise pipeline" of $1.2 million, and has

recruited a number of investors.  *See* AC ¶¶ 26, 30.  But the secondary meaning analysis focuses

on *consumers'* association between the mark and the source, not *investors'*.  As such, Hello I Am

Elliot's investment success is irrelevant to this factor.

  Fourth, there is no allegation in the AC that Hello I Am Elliot has had unsolicited media

coverage of its platform and the ELLIOT mark.  Although the AC does allege that "the press has

reported on ELLIOT," *id.* ¶ 35, there is no indication that this publicity was unsolicited.  *See

Rockland Exposition, Inc.*, 894 F. Supp. 2d at 322 (factor did not support secondary meaning

where plaintiffs provided evidence of publicity but did not show the publicity was unsolicited);

*cf. Carson Optical, Inc.*, 11 F. Supp. 3d at 344 (dismissing trade dress infringement claim where

complaint alleged coverage in periodicals and positive consumer reviews but no unsolicited

media coverage).  In addition, in many cases where this factor favors plaintiffs, plaintiffs have attached examples of such publicity to their complaint.  *See, e.g.*, *Blockchain Luxembourg S.A. v. Paymium, SAS*, No. 18 Civ. 8612 (GBD), 2019 WL 4199902, at *6 (S.D.N.Y. Aug. 7, 2019); *Metrokane, Inc.*, 160 F. Supp. 2d at 640.  The AC does not do so.

Fifth, the AC alleges no attempts—other than the alleged trademark infringement at issue in this suit—to plagiarize the ELLIOT mark.  As a result, this factor does not support a finding of secondary meaning.  *See, e.g.*, *Bubble Genius LLC*, 239 F. Supp. 3d at 600 (factor weighed against inference of secondary meaning where complaint alleged trade dress infringement only by defendants); *Urban Grp. Exercise Consultants, Ltd.*, 2013 WL 866867, at *5 (same); *Metrokane, Inc.*, 160 F. Supp. 2d at 640 (same).

Sixth, and finally, the AC alleges that Hello I Am Elliot has consistently used the ELLIOT mark for a little over three years, since March 2017.  AC ¶ 34.  Although "there is no magical time period which renders a mark sufficiently exclusive; the longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning."  *BigStar Entm't, Inc.*, 105 F. Supp. 2d at 203; *see also Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 348–49 (S.D.N.Y. 2014) (finding it "not implausible" that mark could develop secondary meaning in seven months).  Courts often point to five years of exclusive use of a mark as evidence of secondary meaning.  *See, e.g.*, *Quality Serv. Grp. v. LJMR Corp.*, 831 F. Supp. 2d 705, 709 (S.D.N.Y. 2011) (five years of continuous use of mark is *prima facie* evidence of distinctiveness); *cf. GeigTech E. Bay LLC*, 352 F. Supp. 3d at 284 ("Secondary meaning has been found when continuous exclusive usage of a trade dress occurred over a five-year period." (citation omitted)).  Hello I Am Elliot's three years of use is alone insufficient to support a finding of secondary meaning.  *Cf. Bubble Genius LLC*, 239 F. Supp. 3d at 600 (dismissing trade

dress infringement claim where plaintiff used trade dress exclusively for three years and nine

months). *Compare A.V.E.L.A., Inc.*, 131 F. Supp. 3d at 213 (declining to dismiss trademark

infringement claim where mark had been used for 32 years), *CourtAlert.com, Inc. v. e-Law, LLC*,

No. 12 Civ. 2473 (DAB), 2013 WL 4754819, at *6 (S.D.N.Y. Aug. 26, 2013) (same where mark

had been used for 14 years), *and Blockchain Luxembourg S.A.*, 2019 WL 4199902, at *6 (same

where mark had been used for eight years), *with Metrokane, Inc.*, 160 F. Supp. 2d at 640 (factor

weighed against secondary meaning where trade dress had been used for a year).

Weighing the AC's limited allegations as to advertising expenditures and sales success;

the lack of any allegations of consumer surveys, unsolicited publicity, or attempts to plagiarize

the ELLIOT mark; and the relatively short length of time of exclusive use of the mark, the Court

finds that the AC has not alleged sufficient facts to support an inference of secondary meaning,

or come close to doing so. The Court therefore dismisses, without prejudice, the AC's trademark

infringement claim.

Although plaintiffs have already amended their complaint once, the Court will provide

plaintiffs with one additional opportunity to amend, given the factual nature of a secondary

meaning analysis. Secondary meaning evidence—which sheds light on Hello I Am Elliot's

consumers' perception of the ELLIOT mark—is properly within plaintiffs' knowledge and

control. It is not evidence that plaintiffs can expect to obtain from defendants in discovery.

Therefore, if plaintiffs have as-yet-unpled evidence of secondary meaning, they should be able to

supplement the AC. Plaintiffs will have two weeks from the date of this decision to amend their

complaint a second time. This will be the last opportunity for amendment, and the deadline will

not be extended.

2.      **Copyright Ownership**

The AC seeks a declaratory judgment that Hello I Am Elliot is the sole owner of the copyright of the Elliot platform's computer code.  *See* AC ¶¶ 102, 105–07.  Defendants argue that this count should be dismissed because there is no independent substantive claim to support a declaratory judgment.  *See* Def. Mem. at 13–14.  The Court agrees.

The Declaratory Judgment Act provides federal courts with jurisdiction over cases of "actual controversy."  28 U.S.C. § 2201(a).  The Act does not provide an independent cause of action; instead, "[i]ts operation is procedural only—to provide a form of relief previously unavailable."  *Johnson v. Magnolia Pictures LLC*, No. 18 Civ. 9337 (VB), 2019 WL 4412483, at *3 (S.D.N.Y. Sept. 16, 2019) (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 247 F.R.D. 420, 422–23 (S.D.N.Y. 2007)).  A party seeking a declaratory judgment must thus provide a substantive claim to relief based on a law other than the Declaratory Judgment Act.  *Id.*

The AC fails on two fronts.  First, it does not allege an actual controversy.  And second, it does not supply a cause of action independent of the Declaratory Judgment Act.  The Court addresses each of these shortcomings in turn.

First, the AC fails to allege an actual controversy between plaintiffs and defendants.  Plaintiffs argue that there is a controversy because Sine claimed on the Vander Entities' website to own the Elliot platform.  Pl. Mem. at 12; *see* AC ¶ 56 ("Today, I'm pleased to announce the Beta release of Elliot, our proprietary Omnichannel syndication software[.]"); *id.* ¶ 105 (alleging actual controversy based on this post).  But "an actual controversy cannot be based on the mere existence of [defendant's] claim to copyright" in the Elliot software.  *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 405 (S.D.N.Y. 2012).  Instead, there must be a "real and substantial prospect" that defendants' alleged ownership of the Elliot software will impact plaintiffs' legal rights.  *Id.*; *see also Cosa Instrument Corp. v. Hobre*

*Instruments BV*, 698 F. Supp. 2d 345, 349 (E.D.N.Y. 2010).  Such a prospect is not present here.

Apart from Sine's Internet posting in 2017, plaintiffs do not allege that defendants have used or

infringed their copyright in Elliot.  Moreover, the AC itself alleges that defendants could not use

Elliot's software, even if they wanted to, because they do not have access to Elliot's code nor the

expertise to create or utilize that code.  *See* AC ¶¶ 103–04; *see also Cohen v. Versatile Studios,*

*Inc.*, No. 13 Civ. 8280 (VEC), 2014 WL 1584055, at *3 (S.D.N.Y. Apr. 21, 2014) (no

controversy where plaintiff did not assert that defendant had tried to use computer code, and

plaintiff continued to act as though he owned the code).  There is thus no actual controversy over

which this Court can assert its jurisdiction.

Even if there were an actual controversy, the AC faces a second obstacle:  It has not

alleged an independent cause of action.  While the AC does not state as much, the Court assumes

that plaintiffs base their copyright claim on the Copyright Act.  But neither the Copyright Act,

nor any other relevant statute, supplies a cause of action for the relief the AC seeks: a declaration

of copyright ownership.  *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018).  Further, the

AC cannot rely on the Copyright Act's cause of action for copyright infringement.  That is

because a plaintiff cannot bring a copyright infringement suit "until preregistration or registration

of the copyright claim has been made[.]"  17 U.S.C. § 411(a); *Archie Comic Publ'ns, Inc. v.*

*DeCarlo*, No. 00 Civ. 5686 (LAK), 2001 WL 946496, at *1 (S.D.N.Y. Aug. 21, 2001)

(explaining that copyright registration is prerequisite to bringing suit for copyright infringement).

Plaintiffs here have not registered their copyright in Hello I Am Elliot, and thus would be barred

from pursuing that cause of action—and a corresponding declaratory judgment.[8] *Cf. Johnson*, 2019 WL 4412483, at *3–4 (dismissing declaratory judgment claim for failure to allege substantive cause of action because court had dismissed corresponding copyright infringement claim).

Accordingly, the Court dismisses the AC's claim for a declaratory judgment concerning copyright ownership for failure to allege an actual controversy and for failure to state a substantive cause of action.

### 3.     State Law Claims

The AC also alleges state law defamation and tortious interference claims. As to these claims, the Court declines to exercise supplemental jurisdiction.

Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a district court may, at its discretion, "decline to exercise supplemental jurisdiction" if it has "dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). The Supreme Court has instructed that, in deciding whether to exercise

---

[8] Plaintiffs cite two out-of-Circuit cases in arguing that copyright registration is not required for a declaratory judgment claim. *See* Pl. Mem. at 11 n.57 (citing *Fastcase, Inc. v. Lawriter, LLC*, 907 F.3d 1335, 1340 (11th Cir. 2018); *Mercedes Benz, USA, LLC v. Lewis*, Nos. 19-10948, 19-10949, 19-10951, 2019 WL 4302769 (E.D. Mich. Sept. 11, 2019)). These cases do not sweep as broadly as plaintiffs imagine. Instead of holding copyright registration unnecessary for declaratory judgment actions, they explain that (1) a plaintiff owner's failure to register her copyright can lead to a dismissal for failure to state a claim, but not for lack of jurisdiction, *see Fastcase, Inc.*, 907 F.3d at 1341; and (2) an owner's failure to register her copyright does not prevent an accused infringer from seeking a declaratory judgment of non-infringement, *Mercedes Benz, USA, LLC*, 2019 WL 4302769, at *3. Courts in this Circuit have held similarly. *See, e.g.*, *Archie Comic Publn's, Inc.*, 2001 WL 946496, at *1. The Court's holdings here are consistent with these decisions. The Court faults the AC—brought by plaintiffs for a finding of ownership over Elliot's copyright, not by defendants for a finding of non-infringement of that copyright—for failing to state a claim.

supplemental jurisdiction, a district court should balance the traditional "values of judicial economy, convenience, fairness, and comity," *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), and that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well,'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Although the exercise of supplemental jurisdiction is discretionary, the ordinary case "will point toward declining jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7).

Here, no circumstances counsel in favor of exercising supplemental jurisdiction over the AC's state law claims, given the Court's dismissal at the threshold of all federal law claims. The Court has not invested the judicial resources necessary to resolve these non-federal claims or even determine if the AC has pled sufficient facts to make out a *prima facie* case for either. Nor do convenience, fairness, or comity require the Court to exercise supplemental jurisdiction. Finally, dismissing the state law claims now, at the motion to dismiss stage, would not cause substantial delay because the parties have not yet engaged in discovery. The Court accordingly declines to exercise supplemental jurisdiction over the AC's remaining defamation and tortious interference claims. These claims are dismissed without prejudice. This decision does not prevent plaintiffs from refiling these claims in state court, where they may be properly heard.

## III. Motion for a Preliminary Injunction

Plaintiffs filed a motion for a preliminary injunction to enjoin defendants from using the ELLIOT mark; suggesting ownership, sponsorship, or association with the ELLIOT mark; and claiming ownership of the Elliot platform and underlying software. *See* Pl. PI Mem. at 24–25. Because the Court has dismissed the AC, the preliminary injunction motion based on the claims therein necessarily fails. The Court, however, briefly addresses this motion to note a separate

23

fatal defect in plaintiffs' bid for preliminary relief that justifies its denial with prejudice: the failure to demonstrate irreparable harm.

### A.   Pertinent Background[9]

On June 8, 2017, the Vander Group Instagram page posted a photo of the ELLIOT mark, with the caption:  "Have you gotten a chance to discuss our software Elliot with our team at #irce17 yet?  If not, be sure to schedule a meeting before we head to New York!"  *See* Pl. PI Mem. at 7–8; *see also* Dkt. 47 ("Third Sine Decl."), Ex. E.  This post was on "archive" mode, *i.e.*, not viewable to the public, from August 19, 2019 to September 23, 2019.  Dkt. 49 ("Tucker Decl.") ¶ 3.  Since September 23, 2019, it has been public on Vander Group's Instagram page. *Id.*

On June 21, 2017,[10] the Vander Group Instagram posted again with a reference to the Elliot platform.  *See* Pl. PI Mem. at 8.  This post's caption stated, "Schedule a demo with Vander to see the easy cross border Commerce integration we call Elliot."  *Id.*; *see also* Third Sine Decl., Ex. F.  With regard to this post, plaintiffs note that the Affiliate Agreement allowed defendants to schedule demonstrations for potential Hello I Am Elliot, customers, but argue that the agreement no longer governs their relationship.  *See* Pl. PI Mem. at 8.  The post has always been viewable by the public and remains on the Vander Group Instagram page.  *See* Tucker Decl. ¶ 3.

---

[9] In plaintiffs' memorandum in support of their motion for a preliminary injunction, Pl. PI Mem., and the attached declaration of Sergio Villasenor, Dkt. 39-2 ("Villasenor Decl."), plaintiffs have alleged some new facts not included in the AC, including those reflected in the following.  And, although defendants properly do not dispute the AC's facts for purposes of the motion to dismiss, they do present facts in their opposition to the motion for a preliminary injunction that differ— dramatically and materially—from plaintiffs' account.  *See* Dkts. 46–49.  The Court need not recount nor resolve these many factual disputes, as they are irrelevant to the Court's finding that plaintiffs had failed to provide evidence of irreparable harm.  The Court highlights here only those facts necessary to resolve the present motion for a preliminary injunction.

[10] Although plaintiffs' memorandum states that this post was uploaded on July 21, 2017, the post itself is dated June 21, 2017.  *See* Third Sine Decl., Ex. F.

24

On or around July 20, 2017,[11] the Vander webpage included a post entitled, "Say Hello to Elliot.  Your Passport to Global Commerce."  *See* Pl. PI Mem. at 8–9; *see also* Third Sine Decl., Ex. C.  This post is accompanied by a Vander logo, although it is unclear which Vander Entity the logo references.  *See* Pl. PI Mem. at 8–9; *see also* Third Sine Decl., Ex. C.  The post purports to have been authored by Sine.  *See* Third Sine Decl., Ex. C at 1.  The post states, among other things, that "[t]oday, I'm pleased to announce the Beta release of Elliot, our proprietary Omnichannel syndication software[.]"  *See* Pl. PI Mem. at 8–9; *see also* Third Sine Decl., Ex. C at 1.  This post was in "draft mode" and viewable only by those with access to the Vander website between August 19, 2019 and September 23, 2019.  *See* Tucker Decl. ¶ 2.  Other than that time period, it was—and still is—viewable by the public.  *Id.*

On September 6, 2017, Hello I Am Elliot's counsel sent a cease-and-desist letter to defendants, asking defendants to stop infringing the ELLIOT mark and claiming ownership of the Elliot software.  Pl. PI Mem. at 13; *see also* Third Sine Decl., Ex. L.  Defendants refused.  Pl. PI Mem. at 13.

Over the course of summer 2019, Sine sent a series of emails, to opposing counsel, Hello I Am Elliot investors, and Hello I Am Elliot board members, describing Villasenor's alleged involvement with his ex-girlfriend's litigation and alleging that Villasenor, *inter alia*, misappropriated Hello I Am Elliot funds.  *See* Pl. PI Mem. at 13 (citing AC); *see also id.*, Ex. A (chart of alleged defamatory statements).

---

[11] Defendants have asserted in a sworn declaration that this post was uploaded on May 31, 2017. *See* Tucker Decl. ¶ 2.  Plaintiffs, on the other hand, claim that it was posted on or about July 20, 2017.  *See* Pl. PI Mem. at 8.  Solely for purposes of resolving this motion, the Court assumes *arguendo* that plaintiffs' account of the posting date is correct.

On June 20, 2019, defendants sent a second cease-and-desist letter to Sine and the Vander Entities, requesting that they stop infringing Hello I Am Elliot's trademark and copyright and asking Sine to refrain from his allegedly defamatory statements about plaintiffs.  Pl. PI Mem. at 13; *see also* Third Sine Decl., Ex. O.  Defendants again refused.  Pl. PI Mem. at 13.

On July 24, 2019, plaintiffs filed this lawsuit.  Dkt. 1.  On November 11, 2019, defendants filed their initial motion to dismiss.  Dkt. 22.  On November 22, 2019, plaintiffs filed the AC.  AC.  On December 13, 2019, defendants filed their second motion to dismiss.  Dkt. 28.

In December 2019, Sine sent additional allegedly defamatory emails to Hello I Am Elliot board members and investors.  Pl. PI Mem. at 2; *see also id.*, Ex. A at 7–9; Third Sine Decl., Exs. DD–EE.

On January 22, 2020, plaintiffs filed their motion for a preliminary injunction, Pl. PI Mem., along with the Villasenor Declaration, Villasenor Decl.  The motion seeks relief for the allegedly ongoing acts of trademark and copyright infringements, but not for Sine's alleged defamation.  *See* Pl. PI Mem. at 24–25.  On February 3 and February 11, 2020, defendants, with consent of plaintiffs, requested extensions to file their opposition and corresponding extensions for plaintiffs' reply.  *See* Dkts. 41, 43–44.  The Court granted these requests.  *See* Dkts. 42, 45. On February 14, 2020, defendants filed their memorandum in opposition, Def. PI Mem.; the third declaration of Daniel A. Singer, Esq., Dkt. 48; the third declaration of Derek J. Sine, with attached exhibits, Third Sine Decl.; and the declaration of Van Tucker, Tucker Decl.  On February 28, 2020, in accordance with the extended schedule, plaintiffs filed their reply.  Pl. PI Reply.

### B.    Applicable Legal Principles

The decision to grant or deny a preliminary injunction rests in the district court's sound discretion.  *See Am. Exp. Fin. Advisors Inc. v. Thorley,* 147 F.3d 229, 232 (2d Cir. 1998).  But

a preliminary injunction is an extraordinary remedy that should not be granted as a routine

matter. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990); *Patton v.

Dole*, 806 F.2d 24, 28 (2d Cir. 1986). To obtain a preliminary injunction in the Second Circuit, a

plaintiff must demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the

merits or (2) sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly toward the party requesting the

preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund

Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The plaintiff must also show that the balance of hardships

"tips in plaintiffs' favor," and that the "public interest would not be disserved by the issuance of

a preliminary injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895

(2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)).

### C.    Discussion

Plaintiffs' motion for a preliminary injunction fails at the first step: Plaintiffs have not

shown irreparable harm. Given this fatal defect, the Court declines to address the remaining

elements necessary to obtain a preliminary injunction.

Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a

preliminary injunction[.]" *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45

(2d Cir. 1983) (quoting 11 Wright & Miller, *Federal Practice and Procedure* § 2948, at 431

(1973)). In trademark cases, a plaintiff must show actual irreparable injury. *New Look Party Ltd.

v. Louise Paris Ltd.*, No. 11 Civ. 6433 (NRB), 2012 WL 251976, at *10 (S.D.N.Y. Jan. 11, 2012);

*see also Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*, No. 16 Civ. 5079

(JGK), 2016 WL 4367990, at *3 (S.D.N.Y. Aug. 12, 2016).

A significant factor in assessing whether a plaintiff has shown irreparable harm is delay in seeking injunctive relief.[12]  *See Fashion Week, Inc.*, 2016 WL 4367990, at *3.  Unless sufficiently explained, "delay alone may justify denial of a preliminary injunction" for trademark infringement.  *Tough Traveler*, 60 F.3d at 968 (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)); *see also Citibank*, 756 F.2d at 276 (delay may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction").  Acceptable explanations for delay include plaintiff's ignorance regarding defendant's alleged infringement, plaintiff's good-faith attempts to investigate that infringement, and diligent pursuit of settlement negotiations.  *See Tough Traveler*, 60 F.3d at 968; *Marks Org.*, 784 F. Supp. 2d at 333.  Even if unexplained delay does not justify denying permanent relief, "it may, standing alone, . . . preclude the granting of preliminary injunctive relief, because the 'failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury[.]'"  *Tough Traveler*, 60 F.3d at 968 (internal quotation marks and citation omitted) (quoting *Citibank*, 756 F.2d at 277).

Here, plaintiffs' delay was significant.  Defendants' alleged trademark infringement took place in June and July 2017.  Plaintiffs did not file this lawsuit until July 24, 2019, two years later.  And then, they did not file for a preliminary injunction until January 22, 2020, six months later.

---

[12] In trademark cases, courts used to presume irreparable harm upon a showing of likelihood of success on the merits.  *See New Look Party Ltd.*, 2012 WL 251976, at *10.  In that analysis, evidence of delay was used to rebut that presumption.  *Id.*; *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995).  Following the decision in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), however, such a presumption is no longer permitted.  *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 332 (S.D.N.Y. 2011); *New Look Party Ltd.*, 2012 WL 251976, at *10.  Instead, courts now look to delay as one of several factors relevant to whether a plaintiff has shown that, without a preliminary injunction, it would suffer irreparable harm.  *Fashion Week, Inc.*, 2016 WL 4367990, at *3; *New Look Party Ltd.*, 2012 WL 251976, at *10.

The two-and-a-half-year delay from the time of the alleged infringement to plaintiffs'

seeking of a preliminary injunction amply justifies denying preliminary relief.  "[C]ourts

typically decline to grant preliminary injunctions in the face of unexplained delays of more than

two months." *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 419

(S.D.N.Y. 1998).  Plaintiffs' delay far exceeds the delays that have led to denials of preliminary

injunction in other infringement cases in this Circuit.  *See, e.g.*, *Tough Traveler*, 60 F.3d at 968

(vacating preliminary injunction where plaintiff delayed seeking injunctive relief for least 13

months after becoming aware of infringement); *Citibank*, 756 F.2d at 276 (same for 10 weeks

after plaintiffs' actual notice of infringement and nine months after actual infringement

occurred); *Hornig v. Trs. of Columbia Univ.*, No. 17 Civ. 3602 (ER), 2018 WL 5800801, at *7

(S.D.N.Y. Nov. 5, 2018) (denying preliminary injunction when plaintiff had two-and-half

months of unexplained delay and 15 months of total delay); *Fashion Week, Inc.*, 2016 WL

4367990, at *5 (same for 12 to 18 months); *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d

432, 442–43 (E.D.N.Y. 2013) (same for four months after filing of complaint and 18 months

after infringement occurred); *New Look Party Ltd.*, 2012 WL 251976, at *11 (same for five

months of unexplained delay and 14 months of total delay); *Two Kids From Queens, Inc. v. J &

S Kidswear, Inc.*, No. Civ. 09-3690 (DRH), 2009 WL 5214497, at *3 (E.D.N.Y. Dec. 30, 2009)

(same for five months since plaintiffs learned of infringement); *Marcy Playground, Inc. v.

Capitol Records, Inc.*, 6 F. Supp. 2d 277, 281–82 (S.D.N.Y. 1998) (same for three months of

unexplained delay and nine months of total delay); *Gidatex*, 13 F. Supp. 2d at 420 (same for

four-and-a-half months of unexplained delay and eight months of total delay); *Bear U.S.A., Inc.

v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F. Supp. 896, 910 (S.D.N.Y. 1995) (same for

three to four months); *Century Time Ltd. v. Interchron Ltd.*, 729 F. Supp. 366, 369

(S.D.N.Y. 1990) (same for two months of unexplained delay and six months of total delay).

Plaintiffs do not offer an acceptable reason for the long delay. They do not claim to have

been unaware of the alleged infringement—nor could they, as they sent their first cease-and-

desist letter in early September 2017—or to have been investigating the infringement. Instead,

they state that they had preferred to use their resources to grow the ELLIOT brand, and state that

Hello I Am Elliot's recent growth has made seeking this relief worthwhile. *See* Pl. PI Reply

at 8–9. Although that is a sound explanation for the reason to file this lawsuit at this time, this

explanation is wholly inadequate to show the urgency of injunctive relief. Plaintiffs do passingly

assert that they had sought to resolve the issues through private negotiation, but they do not

allege facts to show that, throughout the two-and-one-half-year period of delay, they were

diligently pursuing settlement. *See id.* at 2, 8. They do not quantify how long they were actively

pursuing settlement.[13] And even if the parties had pursued settlement negotiations for some

brief—or even extended—period of time, the years-long delay here is still so significant as to

preclude relief.

---

[13] Plaintiffs argue that it may be reasonable for new businesses to pursue settlement negotiations, as opposed to costly litigation. *See* Pl. PI Mem. at 8 n.23 (quoting *Vox Amplification Ltd. v. Meussdorffer*, No. 13 Civ. 4922 (ADS) (GRB), 2014 WL 558866, at *17 (E.D.N.Y. Feb. 11, 2014), *report and recommendation adopted*, 50 F. Supp. 3d 355 (E.D.N.Y. 2014)). Be that as it may, plaintiffs do not allege that *they* were engaged with defendants in any kind of good faith settlement negotiations for any specific amount of time, let alone during the approximately 30 months that preceded the instant motion. The only evidence of a settlement attempt in the record comes from the Sine Declaration, which vaguely refers to settlement discussions and notes that plaintiffs' counsel sent defendants a demand on December 6, 2017, which defendants rejected as "completely unacceptable." *See* Third Sine Decl. ¶ 11; *see also id.*, Ex. M. And Sine attests that plaintiffs "disappeared" from any settlement negotiations, and the trademark infringement issues in general, for a year and a half. Third Sine Decl. ¶ 11. Even if the delay here were only for a year and a half (which would not encompass the six-month delay in seeking injunctive relief after the filing of the complaint), that lag would still preclude injunctive relief.

Plaintiffs also note Sine's allegedly defamatory statements in summer and December 2019. *Id.* at 8.  But these are irrelevant to the motion for a preliminary injunction, which seeks relief for defendants' alleged *trademark infringement*, not defendants' alleged defamation. These statements cannot justify plaintiffs' delay.

Accordingly, the Court denies plaintiffs' motion for a preliminary injunction, with prejudice, for lack of irreparable harm.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss and denies plaintiffs' motion for a preliminary injunction.  The Court's dismissal of the AC is without prejudice.  The AC must be amended within two weeks of the date of this order, or the Court will close this case.  No further extensions or opportunities to amend will be granted.  The Court's denial of the preliminary injunction is with prejudice.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 22, 28, and 39.

SO ORDERED.

*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge

Dated: July 2, 2020
       New York, New York

31